# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5942 | **DATE** | 11/26/2002 |
| **CASE TITLE** | Shapo vs. O'Shaughnessy | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motions to dismiss the Complaint (R. 10-1; R. 11-1; R. 12-1; R. 13-1) are granted in part and denied in part. Plaintiff has until 1/7/03 to conduct discovery on Defendants' use of the mails and wires. Plaintiff shall file an amended complaint by 1/21/03 that provides the specific details of this use.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| TH ✓ | courtroom deputy's initials | |

number of notices

NOV 27 2002

date docketed

CV

docketing deputy initials

date mailed notice

U.S. DISTRICT COURT
CLERK
02 NOV 26 PM 5:41

Date/time received in central Clerk's Office

FILED-E...

mailing deputy initials

**Document Number**

40

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NATHANIEL S. SHAPO, Director of Insurance )
of the State of Illinois, as Liquidator of Alpine )
Insurance Company, an Illinois Corporation, )
                    )
                 Plaintiff, )
                    )     No. 01 C 5942
         v. )
                    )     Judge Amy J. St. Eve
PETER O'SHAUGHNESSY, STEVEN SHINN, )
CRAIG RICE, JOHN CLARK, EXSTAR )
FINANCIAL CORPORATION, TCO )
INSURANCE SERVICES, INC., TCO )
INSURANCE SERVICES, and TCO )
HOLDINGS, INC., )
                    )
              Defendants. )

## MEMORANDUM OPINION AND ORDER

Nathaniel S. Shapo (the "Liquidator") filed an eleven count complaint on behalf of the

defunct Alpine Insurance Company ("Alpine"). The Complaint is based primarily on accusations

that the Defendants looted Alpine and its parent Transco from the late-1980s to the mid-1990s.

The allegations include four Racketeering Influenced and Corrupt Organizations ("RICO")

counts and seven state law claims. Before this Court are four motions to dismiss the Complaint.

One motion is a joint filing based primarily on the Defendants' belief that the RICO claims are

time-barred and arguments that the claims lack particularity and fail to otherwise allege

recognized RICO violations. (R. 10-1.) Defendants John Clark and Craig Rice filed separate

motions to dismiss, expanding the timeliness argument as it relates to them. (*See* R. 11-1, R. 12-

1.) Rice also argues in his separate motion that the Complaint contains insufficient allegations to

1

support a claim against him. Finally, Exstar Financial Corporation, TCO Insurance Services, Inc., TCO Insurance Services, and TCO Holdings, Inc. (the "corporate defendants") filed a supplemental motion to dismiss, primarily extending the Defendants' arguments concerning whether the Liquidator has alleged any conduct that amounts to a RICO violation. (*See* R. 13-1.) As detailed below, the motions are granted in part and denied in part.

## BACKGROUND[1]

### I.    The Parties

#### A.    The Liquidator

Nathaniel S. Shapo is the Director of Insurance of the State of Illinois. (R. 1-1, Compl. ¶ 10.) He became Liquidator of the Alpine estate on June 28, 2000, by order of the Circuit Court of Cook County. (*Id.*) As Liquidator, he brings this action on behalf of the Alpine estate to recover to recover property and damages allegedly sustained by Alpine as a result of the Defendants' alleged misconduct. (*Id.* ¶ 11.)

#### B.    Alpine and Transco

Alpine was a stock property and casualty insurance company. It was organized under the laws of Illinois and it maintained its principal place of business in California. (R. 1-1, Compl. ¶ 3.) Before the order of liquidation, Alpine principally wrote excess and surplus lines coverage for commercial casualty liability and ocean marine coverages. It also specialized in underwriting professional liability coverage for architects and engineers on a claims-made basis. (*Id.* ¶ 3.)

---

[1] Although the Court assumes that the Defendants take issue with some of the assertions in the Complaint, this Court must treat these allegations as true for the purpose of deciding the motions to dismiss. *Jang. v. A.M. Miller & Assocs.*, 122 F.3d 480, 483 (7th Cir. 1997). Therefore, this background section exclusively relies upon the Liquidator's allegations for the facts of this case at this stage.

On December 31, 1996, Alpine assumed the assets and liabilities of Transco, its corporate parent. (*Id.* ¶ 4.) Before then, Transco was an excess and surplus lines carrier that was incorporated in Illinois. (*Id.*) Transco was once a member syndicate on the Illinois Insurance Exchange. (*Id.*) Defendants O'Shaughnessy, Exstar Financial Corporation ("Exstar"), and ultimately TCO Holdings, Inc. wholly owned Transco from time to time. (*Id.*)

## C.    The Defendants

The Defendants can be grouped into one of two categories. They are either (1) corporations related to Alpine and Transco or (2) directors and officers of Alpine, Transco, and the corporate defendants (the "individual defendants"). The corporate defendants consist of Exstar, TCO Insurance Services, Inc., TCO Insurance Services, and TCO Holdings, Inc. The individual defendants are Peter O'Shaughnessy, Steven Shinn, Craig Rice, and John Clark.

### 1.    Corporate Defendants

Exstar, an insurance holding company, is a publicly held Delaware corporation headquartered in California. (R. 1-1, Compl. ¶ 18.) Two of its subsidiary operating companies were Alpine and Transco. (*Id.*) TCO Holdings, Inc. is a Delaware corporation that was, at various times, Transco's parent. (*Id.* ¶ 20.)

TCO Services, Inc. ("TCO Illinois") is an Illinois corporation. (*Id.* ¶ 19.) TCO Illinois performed marketing, underwriting claims, management, investment, and general administrative functions for the various corporate defendants. (*Id.*) TCO Insurance Services ("TCO California") is a California corporation. (*Id.*) TCO California performed administrative services for TCO Illinois pursuant to a servicing agreement. (*Id.*) Together, TCO Illinois and TCO California acted as an affiliate underwriting manager and as the managing general agent for

Alpine and Transco. (*Id.* ¶ 3.)

## 2. Individual Defendants

Peter J. O'Shaughnessy and Steve Shinn are residents of California. (R. 1-1, Compl. ¶¶ 12, 14.) Craig Rice is a New Jersey resident, (*Id.* ¶ 16), while John Clark resides in Illinois. (*Id.* ¶ 17.) O'Shaughnessy, Shinn, Rice, and Clark had various roles with Alpine, Transco, and the corporate defendants. O'Shaughnessy was also the controlling shareholder of Alpine, Transco, Exstar, TCO Illinois, and TCO California (collectively, "TCO entities") through his interest in their ultimate parent, TCO Holdings. (*Id.* ¶ 2.)

The Complaint alleges that the individual defendants were executives and directors of the corporate parties as follows:

| Individual | Alpine | Transco | Exstar | TCO Companies |
|---|---|---|---|---|
| O'Shaughnessy | Director 1986-96<br>Chairman 1988-96<br>Exec. VP 1986-92 | Director 1985-96<br>President 1985-93 | President 1988-93<br>CEO 1988-2000<br>Chairman 1988-2000<br>Director 1988-2000 | CEO<br>Director<br>(various dates) |
| Shinn | Exec. VP 1992-95<br>Director 1992-95<br>President 1996 | Sr. Vice President<br>Exec. Vice President<br>President<br>(various dates) | President 1993-95<br>Exec. VP 1992-93<br>Director 1992-93 | President of TCO<br>1993-95<br>Exec. VP of TCO<br>1992 |
| Rice | Director 1989-95<br>CFO 1989-95<br>Exec. VP 1989-95<br>Treasurer 1989-95 | VP 1988-93<br>Asst. Treas. 1988-93<br>Controller 1988-89 | Director 1992-96<br>CFO 1992-96<br>Treasurer 1992-96<br>Exec. VP 1992-96 | CFO 1991 |
| Clark | President 1992-96<br>CFO 1992-96<br>Director 1992-96 | President 1992-96 | Sr. VP 1992-95<br>Asst. Treas. 1992-95 | President 1992-96 |

(*Id.* ¶¶ 12-17.)

4

## II. Substantive Allegations

The Complaint alleges a course of illegal conduct that was purportedly masterminded by O'Shaughnessy and facilitated by Shinn, Rice, and Clark from 1987 until 1996. (R. 1-1, Compl. ¶ 2.) This conduct was effectuated through a series of complex financial transactions that resulted in $19 million being illegally transferred out of Alpine and Transco. (*Id.* ¶ 6.) Because these funds were transferred out of Alpine and Transco, they were not available for the payment of policyholder and creditor claims. (*Id.* ¶ 21.) These transactions took three forms: (1) diversions from premium fund trust accounts; (2) filters of Transco funds through stock swaps; and (3) transfers of money through bogus loans and real estate deals. Each of the individual defendants allegedly profited from the schemes. (*Id.*)

### A. Premium Fund Trust Account Diversions

Pursuant to agreements with Alpine and Transco, TCO Illinois and TCO California were responsible for the administration and safekeeping of Alpine and Transco policyholder premiums. (R. 1-1, Compl. ¶ 22.) Alpine entered into an Amended and Restated Management Agreement with TCO Illinois that was effective January 1, 1991. (*Id.* ¶ 25.) Alpine's Board of Directors – comprised of Defendants O'Shaughnessy, Shinn, Clark, and Rice – executed a written consent of the agreement on November 15, 1991. (*Id.*) Shinn and Rice also executed the agreement as officers of TCO Illinois. (*Id.*) The first paragraph of this agreement provided that:

> [TCO Illinois] shall maintain a trust fund account in a bank that is a federally or state chartered bank and that is a member of the Federal Deposit Insurance Corporation. All premiums and other monies collected or received on behalf of [Alpine] promptly shall be deposited into such bank account.

(*Id.* ¶ 26.)

5

Transco entered into a similar agreement with TCO Illinois that was effective July 1, 1993. (R. 1-1, Compl. ¶ 27.) Paragraph J of that agreement required TCO Illinois to "maintain a trust fund account into which all premiums and other monies collected or received . . . shall be deposited." (*Id.*) Along with TCO Illinois' contractual requirements, TCO California was also obligated to deposit premiums or other funds received in separate and segregated fiduciary accounts to be held on behalf of Alpine and Transco. (*Id.* ¶ 23.) Even outside these contractual obligations, Illinois and California law required TCO Illinois and TCO California to create and maintain separate segregated premium fund trust accounts for premiums collected in those states. (*Id.* ¶¶ 29-33.)

TCO Illinois and TCO California never established or maintained separate and segregated trust accounts as required by the agreements and by state law. (R. 1-1, Compl. ¶¶ 23, 28.) Instead, the Defendants permitted the Alpine and Transco premiums to be commingled with TCO Illinois and TCO California funds. (*Id.* ¶ 34.) Additionally, the Defendants diverted almost $9 million in premium fund trust money to other affiliates over a period of several years. (*Id.*) The individual defendants diverted these funds in order to subsidize the operating losses of O'Shaughnessy controlled affiliates and to enrich the Defendants. (*Id.* ¶ 35.)

At various times during this commingling and diversion, Alpine and Transco were financially unstable and illiquid, as were the other O'Shaughnessy controlled entities. (*Id.* ¶ 36.) O'Shaughnessy, however, caused himself to be paid more than $5 million of the premium fund money that had been wrongfully misappropriated. (*Id.* ¶ 37.) Additionally, O'Shaughnessy improperly used hundreds of thousands of dollars of Alpine and Transco premiums for various personal expenses. (*Id.*)

## B.      Stock Swap with Jeffrey Beresford-Wood

In December 1989, the individual defendants caused TCO Holdings, Inc., Transco and Exstar to enter into a series of financial transactions that were designed to effectively divert and upstream Transco funds to its then parent, TCO Holdings. (R. 1-1, Compl. ¶ 57.) Beresford-Wood was the sole shareholder of JBW & Co., as well as other insurance companies. JBW & Co. controlled Concord General Corporation ("Concord"), a privately held insurance holding company. (*Id.* ¶ 58.)

O'Shaughnessy and Beresford-Wood agreed to swap preferred stock in insurance holding companies. (*Id.* ¶ 60.) The exchanges were illusory since the preferred stock of each entity was of little or no value. (*Id.* ¶ 59.) The benefit was that their respective parent companies were paid approximately $19 million each from the other's subsidiary. For the Defendants, Beresford-Wood was necessary to consummate the transaction. Had Transco directly paid this money to its parent companies, regulatory oversight would have been triggered. (*Id.* ¶ 61.)

The swap took the following form: Beginning in late 1989, O'Shaughnessy caused Transco to purchase $15 million of preferred stock in Concord. (*Id.* ¶ 60.) Simultaneously, First Horizon Insurance Company, Beresford-Wood's insurance entity, purchased $15 million of preferred stock in Exstar. (*Id.*) The net effect was that Exstar ended up with $15 million in liquid cash, while Transco's cash reserves were depleted by the same figure. (*Id.*) Transco's only showing for the $15 million was ownership of Concord preferred stock that had minimal value. (*Id.* ¶¶ 59, 61.)

The stock transaction scheme, however, did not end there. The Defendants created a dividend and redemption scheme to circulate another $4 million to TCO Holdings. This was

accomplished through a Transco dividend that was worth four times the value of the stock itself. (R. 1-1, Compl. ¶ 62.) On December 12, 1990, O'Shaughnessy, acting unilaterality for the Transco Board of Directors, executed a Unanimous Written Consent in Lieu of a Board Meeting. (*Id.*) This consent authorized Transco's payment of a $4.00 per share dividend. (*Id.*) TCO Holdings was Transco's sole shareholder at the time, owning $1 million shares. (*Id.*) Transco then transferred to TCO Holdings $4 million worth of Concord preferred stock by way of dividend. (*Id.*)

Although the Concord stock really had questionable value, TCO Holdings sold the shares back to Concord for $4 million in April 1991, when Concord redeemed exactly $4 million in preferred shares. (R. 1-1, Compl. ¶ 62.) O'Shaughnessy applied the redemption entirely to shares owned by TCO Holdings and none to the $11 million in shares still owned by Transco. (*Id.*) This dividend scheme therefore allowed TCO Holdings to receive the entire value for the shares acquired by the Transco dividend. This redemption further depleted the value of the shares of Concord still owned by Transco.

Beresford-Wood received his end of the dividend and redemption scheme just two months later. In June 1991, O'Shaughnessy caused Exstar to redeem $4.25 million of the preferred stock that it had previously issued to First Horizon. (*Id.*)

From 1990 to 1994, Transco received dividends totaling $5,946,625 on its remaining $11 million in preferred Concord stock at the stated rate of 11.3%. (*Id.* ¶ 63.) Transco did not receive any dividends in 1995. (*Id.*)

In 1992 and 1993, Exstar and Concord planned initial public offerings. (R. 1-1, Compl. ¶¶ 64, 65.) If Concord became a public corporation, however, it would have seen an increase in

market value and regulatory scrutiny. (*Id.*) In order to continue with the illicit scheme, O'Shaughnessy, Shinn, and Clark caused the Concord preferred stock to be exchanged in late 1993 for preferred stock in JBW & Co. that was essentially worthless. (*Id.* ¶ 66.) The Defendants planned to convert the Concord preferred stock into debt of JBW & Co. (*Id.*)

In December 1995, the stock of JBW & Co. was exchanged for a secured promissory note, pursuant to written documents that were executed by JBW & Co., Concord, Beresford-Wood, and Transco. (R. 1-1, Compl. ¶ 67.) The promissory note was secured by 81% of the outstanding stock of Classic Fire & Marine Insurance Company, an Indiana Insurance corporation that was a wholly owned subsidiary of Concord. (*Id.* ¶ 68.) At the same time Classic Fire & Marine Company's surplus was reduced by approximately fifty-percent due to a restructuring. (*Id.*) This restructuring dramatically reduced its ability to repay the loan to Transco. As a result, Transco's potential to support its reinsurance obligation to Alpine was also lessened. (*Id.*)

Classic Fire & Marine Insurance Company is in liquidation, after being placed in rehabilitation in 1998. (*Id.*) In December 1997, the promissory note was discharged in consideration of Alpine's receipt of $2,260,252. At the time, the total outstanding principal and interest was $14,037,533. (*Id.* ¶ 69.)

## C.    The Illicit Transfers of Alpine Premium Fund Money to O'Shaughnessy

The individual defendants caused Alpine, Transco and TCO Holdings to enter into numerous fraudulent transactions that were designed to transfer money to O'Shaughnessy under the guise of secured loans and real estate transactions. (R. 1-1, Compl. ¶ 72.) At the same time that these corporations were providing money to O'Shaughnessy as part of these schemes,

9

Alpine, Transco, and TCO Holdings were experiencing severe liquidity difficulties and were in desperate need of the money they were transferring to O'Shaughnessy. (*Id.*) O'Shaughnessy understood at the time that the purported collateral was or would be essentially worthless. He entered into the loan agreements never intending to repay the money. (*Id.*)

As of December 1996, O'Shaughnessy owed TCO Holdings $4,797,904. (R. 1-1, Compl. ¶ 73.) The only collateral for this debt was O'Shaughnessy's personal guarantee and the capital stock of TCO Holdings and its subsidiaries. (*Id.*) That stock was of questionable value because the Defendants had looted the companies. (*Id.* ¶ 72.) The loan proceeds came from the wrongfully commingled insurance premiums of Alpine and Transco. (*Id.* ¶ 73.) O'Shaughnessy never paid down his loan and the other Defendants never pursued his payment. (*Id.* ¶ 74.)

From 1991 to 1996, Transco and Alpine purchased $4,794,000 in real estate from O'Shaughnessy. (R. 1-1, Compl. ¶ 75.) The transactions included Transco's purchase of O'Shaughnessy's personal residence for $2.5 million in 1991. (*Id.* ¶ 76.) After the purchase, O'Shaughnessy leased back the home for approximately $3,000 per month. (*Id.*) In July 1995, Transco purchased eight lots for residential construction from O'Shaughnessy for a little more than $1 million dollars. (*Id.* ¶ 75.) These real estate transactions were intended to help resolve O'Shaughnessy's personal liquidity problems. (*Id.*)

### D. False Statements Submitted to the Illinois Department of Insurance

#### 1. Non-Resident Insurance Producer Applications

O'Shaughnessy submitted and caused to be submitted a series of knowingly false Non-Resident Insurance Producer Applications to the Illinois Department of Insurance for the years 1989 to 1996. (R. 1-1, Compl. ¶ 38.) O'Shaughnessy, who signed these applications under

10

penalties of perjury, falsely stated that premium fund trust accounts were being properly maintained. (*Id.*)

## 2. Annual Statements

Additionally, O'Shaughnessy, Clark, Shinn, and Rice caused annual statements of Alpine and Transco to be submitted to the Illinois Department of Insurance and the Illinois Insurance Exchange through 1995. (R. 1-1, Compl. ¶ 39.) These annual statements were knowingly false in several ways. First, they listed substantial agents' balances as admitted assets. (*Id.*) The individuals knew, however, that TCO Illinois and TCO California were insolvent and that those balances were uncollectible because the funds had been used to underwrite losses incurred by O'Shaughnessy's affiliated companies. (*Id.*) Second, the annual statements falsely portrayed the preferred stock transactions with Beresford-Wood as legitimate by including them as admitted assets. (*Id.*) Third, the 1992 through 1995 annual statements represented that all assets of the companies were exclusively under the insurance companies' control. (*Id.*) These assets were under the control of O'Shaughnessy, however, and were being misappropriated by him, with assistance from Rice, Clark, and Shinn. (*Id.*) Fourth, the 1995 annual statement reflected the collateral loan as an asset. (*Id.*) The individual defendants, however, knew this loan was worthless. (*Id.*)

O'Shaughnessy and Clark signed the 1991 and 1992 Annual Statements of Transco. (R. 1-1, Compl. ¶ 70.) Clark signed the 1993 and 1994 annual statements. (*Id.*) Rice, Clark, and Shinn knew of the falsity of the annual statement filings, but did nothing to correct the violations or to inform appropriate authorities. (*Id.* ¶ 40.)

11

## E.    The Schemes are Uncovered

In 1996, the liquidity problems that Alpine and Transco were experiencing came to light both internally and externally. These discoveries caused the Illinois Department of Insurance to issue a Corrective Order.

### 1.    Alpine's Controller expresses concerns

On January 19, 1996, Alpine's Controller, David Gay, expressed concern about the diversion of Alpine's premium fund money by TCO Illinois and TCO California. Gay sent a memorandum to Defendants Rice and Clark regarding the diversion of these funds:

> I can't stress enough the seriousness of the situation. I don't see how TCO is going to pay the insurance companies the $6.4 million in 1995 premium collections on a timely basis or how Alpine's intercompany balances are going to be cleared. I was disappointed to hear the Illinois Director of Insurance was not informed about the cash flow situation. I shudder to think of the consequences when the Illinois Director of Insurance begins their [sic] audit in the Spring and discovers the situation. That's assuming we are able to get KPMG to sign off under these conditions.

(R. 1-1, Compl. ¶ 42.) On April 27, 1996, Gay reiterated his concern over Alpine's finances:

> I am writing to document our conversation today and on April 19, 1996. On April 19, 1996 I called you expressing my continued concern over the cash flow situation, whereby operating expenses for the TCO/Exstar Group are being paid from premium belonging to Alpine Insurance Company . . . . You also said that the company will be meeting with the Department of Insurance on May 6 to fully disclose so called out of trust situation. I think the Department of Insurance should be notified immediately about the situation as it is apparent that TCO doesn't have the capability to pay back the money it owes Alpine, and the situation continues to deteriorate. Under the circumstances, I don't feel comfortable approving wire and transfers from Alpine Insurance Company. I request that you approve these wires.

(*Id.* ¶ 43.)

## 2. Alpine's rating is downgraded

On April 18, 1996, A.M. Best, which publishes insurance carrier ratings, downgraded Alpine from a B (Adequate) to a C (Marginal). (R. 1-1, Compl. ¶ 45.) The downgrade reflected concerns that Alpine would not be able to collect receivables from its affiliates and reinsurance from Transco. (*Id.*) At the time, Exstar, Transco, TCO Illinois, and TCO California owed Alpine approximately $4.2 million. (*Id.*) Transco also owed Alpine $13.5 million in reinsurance recoverables. (*Id.*) In its downgrade, A.M. Best cited Alpine management's lack of oversight with respect to its claims reserving practices, weak level of capitalization, and continued operating losses. (*Id.* ¶ 46.)

## 3. The Illinois Department of Insurance becomes involved

After the A.M. Best downgrade, the Illinois Department of Insurance investigated Alpine. (R. 1-1, Compl. ¶ 47.) The Department of Insurance determined that Alpine was operating in a manner that was hazardous to the policyholders. (*Id.*) It found that Alpine was owed: (1) almost $9 million in Agents' balances by TCO Illinois and TCO California, (2) almost $1 million by TCO Illinois and TCO California from a profit sharing provision of their agreement, (3) more than $2 million by Transco due to a loan, and (4) approximately $2.5 million by Exstar from a tax allocation agreement and other fee advances. (*Id.* ¶ 48.) The Department of Insurance concluded that Alpine, TCO Illinois, and TCO California had not properly transferred agents' balances and that Alpine and its affiliates had initiated funds transactions that were in violation of the Illinois Insurance Code. (*Id.* ¶ 49.) It issued a Corrective Order on July 5, 1996. (*Id.* ¶ 47.) The Corrective Order prohibited Alpine and its officers, owners, and directors from engaging in further specified transactions without written approval of the Director. (*Id.* ¶ 49.)

After the issuance of the Corrective Order, O'Shaughnessy, Shinn, and Clark met with the Department of Insurance. (R. 1-1, Compl. ¶ 50.) During that meeting, they admitted that they had treated all of the TCO entities as essentially one company. (*Id.*) O'Shaughnessy, Shinn, and Clark did not, however, come clean about the $9 million in uncollected agents' balances. (*Id.* ¶ 51.) They claimed that the funds had been used in furtherance of Alpine's business. (*Id.*) In fact, those funds had been misappropriated, as O'Shaughnessy, Shinn, and Clark knew. (*Id.*) After the meeting, Alpine was no longer permitted to include in its annual financial statements non-collectible agent balances of nearly $9 million as admitted assets. (*Id.* ¶ 52.) The Liquidator alleges that O'Shaughnessy, Shinn, Rice, and Clark misused the wrongfully commingled Alpine and Transco premiums. (*Id.* ¶ 54.)

### 4. Liquidation Order

In early January 1999, the Liquidator filed a complaint against Alpine in the Circuit Court of Cook County for conservation and injunctive relief. (R. 1-1, Compl. ¶ 7.) The parties consented to a conservation order on January 8, 1999. (*Id.*) On June 28, 2000, the Circuit Court of Cook County issued judgment, ordered Alpine's liquidation, and appointed Shapo as Liquidator. (*Id.* ¶¶ 7, 10.) The Illinois Appellate Court affirmed the order on December 21, 2000. The Illinois Supreme Court denied Alpine's petition for leave to appeal on April 4, 2001.

## III. The Complaint

On August 3, 2001, Shapo filed this Complaint as Liquidator of Alpine. The Complaint is an attempt to recover property and damages sustained by Alpine as a result of the Defendants' alleged misconduct. The Complaint contains eleven counts and names O'Shaughnessy, Shinn, Rice, Clark, Exstar, TCO Illinois, TCO California, and TCO Holdings, Inc. as Defendants.

Counts I, II, III, and IV are claims for purported federal RICO violations. The remaining counts are state law claims.

## A. The RICO Causes of Action

The Liquidator alleges four RICO counts against the Defendants. He claims that the Defendants violated 18 U.S.C. § 1962 (a)-(d). These counts are based upon the same predicate acts.

### 1. Alleged predicate acts

The Liquidator claims that the Defendants engaged in three types of predicate acts: mail fraud, wire fraud, and money laundering. He alleges that the mail and wire fraud took four forms. First, from 1987 through early 1996, the diverted premium fund money was sent through United States mails on hundreds of occasions, "the exact number and time of which are presently unknown to the Liquidator." (R. 1-1, Compl. ¶ 54.) Second, the Liquidator alleges that the Defendants used the mails in connection with the false annual certifications in Non-Resident Insurance Producer Applications, which were submitted to the Illinois Department of Insurance from 1989 to 1996. (*Id.* ¶¶ 38, 54.) Third, he claims that the Defendants caused false and fraudulent annual statements from Alpine and Transco to be sent to the Illinois Insurance Exchange and others. (*Id.* ¶ 70.) Fourth, the Liquidator alleges that the Defendants misappropriated the premium fund trust money via wire transfers that were ordered by the individual defendants. (*Id.* ¶ 53.)

The Liquidator claims that the Defendants engaged in money laundering in two ways. First, he claims that the diversion of the premium fund money constitutes money laundering. (*Id.* ¶ 56.) Second, he asserts that the O'Shaughnessy real estate transactions and loans were money

15

laundering violations. (*Id.* ¶ 78.)

### 2. The individual RICO allegations

In Count I, the Liquidator alleges that the Defendants violated § 1962(c) by conducting or participating in the conduct of the purported enterprises through a pattern of racketeering activity. (*See* R. 1-1, Compl. ¶¶ 85-92.) The Liquidator claims in Count II that the Defendants acquired or maintained an interest in or control of the purported enterprises in violation of § 1962(b). (*See id.* ¶¶ 93-95.) In Count III, the Liquidator maintains that violated § 1962(a) by injuring Alpine and Transco through the investment of income received from the pattern of racketeering activity. (*See id.* ¶¶ 96-98.) The Liquidator alleges in Count IV that the Defendants conspired in violation of subsection § 1962(d) to violate subsections (a), (b), and (c). (*See id.* ¶¶ 99-103.)

### B. State Law Claims

Counts V, VI, VII and IX are state law claims directed towards all of the Defendants. Count V is an attempt to recover for a purported civil conspiracy. (R. 1-1, Compl. ¶¶ 104-105.) Count VI alleges fraud. (*Id.* ¶¶ 106-108.) Count VII is a claim for conversion. (*Id.* ¶¶ 109-111.) Count IX is an attempt to recover for purported unjust enrichment. (*Id.* ¶¶ 119-121.)

The remaining state law claims pertain only to some of the Defendants. Count VIII alleges breaches of fiduciary duties against only the individual defendants and TCO Holdings. (*Id.* ¶¶ 112-118.) Count X is a claim for gross negligence against the individual defendants. (*Id.* ¶¶ 122-126.) Finally, Count XI alleges a breach of duty against TCO Illinois and TCO California. (*Id.* ¶¶ 127-130.)

# ANALYSIS

The Defendants have challenged the complaint under Rules 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion tests the sufficiency of the complaint; it is not designed to resolve the case on the merits. *Petri v. Gatlin*, 997 F.Supp. 956, 963 (N.D. Ill. 1997) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356, at 294 (2d ed. 1990)). When determining whether to grant a 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true. *Jang. v. A.M. Miller & Assocs.*, 122 F.3d 480, 483 (7th Cir. 1997). A court must also draw all reasonable inferences in the plaintiff's favor. *Id.* A complaint should be dismissed under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

The Defendants put forth several arguments attacking the Complaint. In the four motions, the Defendants argue that: (1) the RICO causes of action are time-barred; (2) the RICO counts otherwise do not state a claim; (3) many of the state law causes of action do not state claims; (4) the Complaint fails to adequately allege any wrongdoing by any of the corporate defendants; and (5) the Complaint fails to adequately allege any wrongdoing by Rice. The Court addresses each argument below.

## I. The RICO Claims Are Not Time-Barred

Statute of limitations defenses are frequently inappropriate for resolution on a motion to dismiss because their application for the most part depends upon factual determinations. *Johnson Controls, Inc. v. Exide Corp.*, 129 F.Supp.2d 1137, 1142 (N.D. Ill. 2001). If a plaintiff,

however, alleges facts that show that his action is time-barred, he may plead himself out of court. *Id.* All reasonable inferences must be drawn in plaintiff's favor when a defendant seeks a dismissal because the claim is time-barred. *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir. 1993).

For a number of years, the correct statute of limitations to apply in civil RICO cases was in doubt. In 1987, the Supreme Court ended the confusion by finding that civil RICO claims borrowed the Clayton Act's limitation provision. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 146, 107 S.Ct. 2759, 2762, 97 L.Ed.2d 121 (1987). Under that statute, causes of action are "forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. The Seventh Circuit has found that limitation periods begin to run in RICO actions once there is a RICO violation and the plaintiffs know or should know that they have been injured. *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir. 1992).

The parties first dispute when the limitations period began to run. The Defendants claim that the limitations period should have started at the issuance of the Corrective Order, because the Liquidator clearly knew of the injuries at that point. The Liquidator counters that the limitations period should have begun when he became Liquidator of the Alpine estate. The Court agrees with the Defendants' position, but not for the reasons they suggest.

### A.    The Limitations Period did not Begin when the Liquidator had Knowledge of the Defendants' Conduct

The Defendants claim that the proper measure of the running of the statute of limitations starts with the Liquidator's knowledge of the Defendants' conduct. The Defendants argue that

18

the Liquidator's issuance of a Corrective Order shows that he knew of the injuries, at the very latest, on July 5, 1996. Because this lawsuit was not filed until five years after the Corrective Order's issuance, and the statute of limitations for RICO cases is four years, the Defendants argue that these claims are, therefore, time-barred. The Liquidator counters that the statute of limitations did not begin to run until June 28, 2000, when he was named liquidator of the Alpine estate and therefore first had standing to bring a lawsuit on behalf of Alpine. The Liquidator argues that the RICO claims are timely because the Complaint was filed only a year after the liquidation order.

The Court does not agree with either argument. The Defendants' assertion that the limitations should be measured from when the Liquidator first knew of the injury is erroneous. Although Shapo had the ability in 1996 – as the Director of Insurance – to liquidate or rehabilitate Alpine under 215 ILCS 5/188, he had no standing to assert a RICO claim upon the company's behalf until he became Alpine's Liquidator in 2000. *See* 215 ILCS 5/191 (upon liquidation of Alpine, the Director of Insurance was "vested by operation of law with . . . rights of action of the company as of the date of the order directing rehabilitation or liquidation."). Without standing to bring the RICO action until he became liquidator of Alpine, the Liquidator's RICO causes of action had not "accrued" and the statute of limitations had not begun to run. *See Emich Motors Corp. v. General Motors Corp.*, 229 F.2d 714, 719 (7th Cir. 1956) ("statutes of limitations begin running on the date on which the plaintiff first has right to bring action."). If the Court were to begin the limitations period from when the Liquidator's RICO claims had accrued, the date of the Circuit Court's order of liquidation instead of the date of the Corrective Order would be the appropriate point of reference and the Liquidator's arguments would prevail.

19

But the Court disagrees with the Liquidator's argument that the clock only began to tick when Shapo became Alpine's Liquidator. Although the Liquidator is the named plaintiff, he brings the action on behalf of Alpine. Therefore, Alpine is the focal point of the allegations for determining the proper measure of the statute of limitations. *Cf. Trustees of Hotel Employees & Rest. Employees Int'l Union Welfare Pension Fund v. Amivest Corp.*, 733 F.Supp. 1180, 1185 (N.D. Ill. 1990) (even though trustees were named plaintiffs in the caption, the trust was the focal point of the allegations). Therefore, the Court must look to Alpine to determine the appropriate beginning of the limitations period.

**B.    The Limitations Period Began when Alpine Knew of its Injuries, but were Tolled because of the Defendants' Adverse Domination of the Company**

Alpine knew of the injuries by 1996 when the Director of Insurance issued the Corrective Order. Unless there is a reason to toll the limitations period, the Liquidator's claims are therefore be time-barred. The Liquidator contends that a tolling doctrine[2] – specifically the adverse domination doctrine – should extend limitations period.

Under the adverse domination doctrine, the statute of limitations period is tolled if an entity is controlled by or dominated by wrongdoers. *Resolution Trust Corp. v. Gallagher*, 800 F.Supp. 595, 600 (N.D. Ill. 1992), *aff'd*, 10 F.3d 416 (7th Cir. 1993). The doctrine is recognized under federal law and has been applied to RICO cases. *See, e.g., Washburn v. Brown*, No. 81 C

---

[2] Tolling doctrines are "grafted on to federal statutes of limitations," *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1991), including the civil RICO statute of limitations. *Bontkowski v. First Nat. Bank of Cicero*, 998 F.2d 459, 462 (7th Cir. 1993); *see also Johnson Controls*, 129 F.Supp.2d at 1143-44 (applying tolling doctrines in the RICO context).

1475, 1987 WL 15174, at *5 (N.D. Ill. July 27, 1987).[3] If the doctrine is applicable, the statute of limitations only begins to run again when the defendants lose control of the entity. *Gallagher*, 800 F.Supp. at 600. The adverse domination doctrine is premised on the principle that officers and directors who have harmed the entity cannot be expected to take legal action against themselves. *Id.*

The Liquidator claims that an Illinois statute, 215 ILCS 5/194(b), has codified the adverse domination doctrine and that the Court is required to toll the limitations period. The statute allows Illinois' Director of Insurance to:

> within 2 years after the entry of an order for rehabilitation or liquidation or within such further time as applicable law permits, institute an action, claim, suit, or proceeding upon any cause of action against which the period of limitation fixed by applicable law has not expired at the time of filing of the complaint upon which the order is entered.

215 ILCS 5/194(b). The Defendants counter that this statute is inapplicable because a state statute cannot affect the limitations period of a federal claim. The Court doubts this statute's application to the RICO claims. But there is no need to decide this issue because the Court finds that the adverse domination doctrine, as recognized by federal courts, applies here.

The Liquidator has alleged that the Defendants ultimately controlled Alpine and Transco.

---

[3] The Defendants assert that *Washburn* cannot be used to show the adverse domination doctrine's use in federal actions because the case was decided when this district borrowed Illinois' two-year statute of limitations for RICO claims. Contrary to this assertion, our district's current Chief Judge Kocoras decided a motion to reconsider in *Washburn* after the Supreme Court had ruled that RICO actions borrow the Clayton Act's statute of limitations. *See Washburn*, 1987 WL 15174 at *5. Therefore, *Washburn* is applicable. The cases cited by the Defendants that purportedly show that the adverse domination doctrine is not "resolved" mainly involve whether courts can apply the federal doctrine to state law claims. Here, this is not an issue because both the doctrine and the RICO claims are federal in nature.

The Liquidator has provided much detail of how the Defendants used their positions of power and authority to loot the companies. The Defendants did not lose their control of the entities until the liquidation order was issued in June 28, 2000. The Court finds that given the allegations in the Complaint and providing the Liquidator with all reasonable inferences, it is not appropriate to dismiss the RICO claims as time-barred because the adverse domination doctrine is applicable.

Further, equity favors allowing the case to proceed because the Liquidator has not been dilatory in filing the Complaint. Shapo did not have standing to bring this suit until he became Liquidator. He filed the complaint for liquidation in the Circuit Court of Cook County on August 4, 1999 – eleven months before the Defendants claim that the limitations period expired. On June 28, 2000, the Circuit Court ordered liquidation. The Illinois Appellate Court affirmed the order on December 21, 2000. The Illinois Supreme Court denied Alpine's petition for leave to appeal on April 4, 2001. The Liquidator filed this Complaint less than four months later. It does not appear that the Liquidator unnecessarily delayed once he had standing to sue on Alpine's behalf.

The Defendants cite to *Resolution Trust Corporation v. O'Bear, Overholser, Smith & Huffer*, 886 F.Supp. 658 (N.D. Ind. 1995), to support their argument that the statute of limitations ran as soon as the Liquidator issued the Corrective Order in 1996. The court in *O'Bear*, however, conducted a fact-specific analysis at the summary judgment stage. In that case, the court found that the domination on the board ended when a government employee became the "Supervisory Agent." As Supervisory Agent, the government employee could force any Board member to resign unilaterally. The Supervisory Agent also had the power to recommend a replacement Board member, who the Board was compelled to elect. Not only did the

Supervisory Agent have power, but the governing body also knew of all the conduct alleged in the *O'Bear* complaint at the time that the Supervisory Agent was appointed.

None of these important facts in *O'Bear* are before this Court. At this stage, the Court must consider only the Liquidator's allegations. Facts brought to the Court's attention later may show that equity does not favor the application of the adverse domination doctrine because of the extent of the Liquidator's knowledge at the time that he issued the Corrective Order or the power he maintained pursuant to the Corrective Order. Indeed, that is what happened in *O'Bear*, where the court granted a motion for summary judgment after initially denying a motion to dismiss brought on the same grounds. *O'Bear* is wholly consistent with the Court's ruling that it is premature to determine that the RICO claims are time-barred.

## II.    The Liquidator Has Stated Claims For RICO Violations

The Defendants next attack the substance of the RICO claims. The Defendants put forth just about every possible argument in support of their motions. The Defendants' contentions relate to the RICO claims generally, as well as the allegations specific to subsections (a)-(d). The Court addresses the general arguments first.

### A.    The Liquidator's Allegations State A Pattern Of Racketeering Activity

Each alleged RICO subsection requires a plaintiff to show that the defendants engaged in a pattern of racketeering activity. *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1303-04 (7th Cir. 1987). This pattern must be comprised of at least two predicate acts within ten years that have "continuity plus relationship." *Id.* (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14, 105 S.Ct. 3275, 3285 n.14, 87 L.Ed.2d 346 (1985)).

23

## 1.     The RICO Predicate Act Allegations Are Sufficient

The Defendants argue that the Liquidator has not alleged the predicate acts with sufficient particularity. The Liquidator counters that his allegations are sufficiently particular and, even if they are not, the disparity of knowledge should compel the Court to relax the particularity requirements and find that dismissal is not appropriate.

Rule 9(b) requires a plaintiff alleging fraud to state with particularity the circumstances constituting the fraud. Fed. R. Civ. P. 9(b). This heightened pleading requirement is designed "to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). With this requirement, Rule 9(b) "serve[s] three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994).

Under Rule 9(b), a complaint based on fraud must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992). In other words, Rule 9(b) requires the identification of "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

The Liquidator argues, however, that he does not need to plead with particularity the "who, what, when, where and how" of the wire transfers and mailings because he has provided adequate details about the fraudulent scheme itself. The Liquidator cites to two cases in other

circuits in support of this argument. The Third Circuit has found that there are other ways to meet the particularity requirement of 9(b) without allegations of time, place, and date. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (finding that plaintiff had met burden where it described in detail the items subject to the fraud and the "nature and subject" of the supposed misrepresentations). Similarly, the Eighth Circuit has found that 9(b) does not require specific pleading of mail or telephone use where they themselves did not contain any misrepresentations. *See Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920-21 (8th Cir. 2001). The Liquidator argues that this Court should adopt the Third and Eighth Circuit position, because the circumstances constituting fraud were not the mailings or wire transfers. Rather, the fraudulent scheme was the diversion of the money from Alpine and Transco. The Liquidator maintains that there is no question that the Complaint is full of sufficient facts regarding these diversion.

The Court will not adopt this position because it is bound by Seventh Circuit precedent, which still requires a plaintiff to plead with specificity the underlying predicate acts, including the "who, what, where, when and how" of the mailings and wire transfers. *See Emery v. American Gen'l Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998) (plaintiff in a RICO fraud case "needs to allege more than one fraud, and thus satisfy Rule 9(b) as it were twice."); *Midwest Grinding Co. Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992) ("complaint must, at minimum, describe the predicate acts with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud.") (internal quotations and citations omitted).

Although the Seventh Circuit has not allowed Rule 9(b) to be relaxed when the fraudulent scheme itself is alleged with particularity, our Court of Appeals does permit a court to loosen the

requirements upon a showing that a plaintiff needs discovery to obtain the particulars of the alleged fraud that could not have been obtained without discovery. *Emery*, 134 F.3d at 1323 (citations omitted). Therefore, the Court will relax the Rule 9(b) requirements where appropriate.

### a. The Liquidator sufficiently alleged mail and wire fraud as predicate acts

This Court finds that the Liquidator has met Rule 9(b)'s requirements for specificity with its mail and wire fraud allegations. The Defendants try to make a lot out of the Liquidator's general allegations regarding use of the mails. But the Defendants conveniently ignore, however, the allegations regarding specific mailings and wire transfers. In any case, as discussed below, any lack of specificity is directly attributable to the disparity of knowledge between the parties.

### (1). The Liquidator's allegations meet the particularity requirement for mail and wire fraud

With respect to the Non-Resident Insurance Producer Application certifications, the Complaint specifies the who (O'Shaughnessy with knowledge of his co-defendants), what (false certification), where (from California to Illinois), when (annually from 1989 through 1996) and how (mail) of the Non-Resident Insurance Producer Application certifications. (R. 1-1, Compl. ¶¶ 35, 38-40, 53.) The Complaint details the relevant content and falsities. The allegations concerning the mailing of these certificates can therefore withstand a Rule 9(b) motion.

Further, the Liquidator has adequately pled the use of wires. The Liquidator attached as an exhibit to its Complaint a memorandum that reflects instances that improperly diverted premiums were purportedly commonly transferred by wire. (*See* R. 1-1, Compl., Ex. 3.) It shows that $2 million was transferred in December 1995, $700,000 was transferred in December

1995, and two $600,000 transfers occurred in January 1996 and June 27, 1996. The Defendants have the information regarding these and other wire transfers. The Liquidator should be allowed discovery on these matters.

Additionally, the Liquidator alleges that the Defendants "submitted" Alpine and Transco annual statements in furtherance of their scheme to the Illinois Department of Insurance and others. While the Liquidator did not allege in its Complaint that these annual reports were mailed, the Court will allow the Liquidator to conduct discovery on this issue, with leave to amend once he discovers whether the mails or wires were used in connection with the distribution of the annual reports.

Also, a loosening of the particularity requirement is appropriate at this time to determine the extent of the Defendants' use of the mails and wires in connection with the diverted premium fund money. This information appears to be exclusively in the control of TCO Illinois, TCO California, and the affiliates who purportedly received the diversions. The Liquidator is therefore excused from specificity on this subject. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994); *Petri*, 997 F.Supp. at 974. The Liquidator should amend his complaint once this information is discovered.

The Defendants argue that the Liquidator improperly lumps all defendants together in its allegations of mail and wire fraud. A plaintiff may, however, link a corporate defendant's use of mails or wires to individual defendants. In *Petri*, the defendants also complained that the plaintiffs had lumped the defendants together in the allegations of fraud. Judge Grady found, however, that the plaintiffs had satisfied 9(b)'s requirements:

27

> The plaintiffs have alleged all of the details they reasonably could
> have been expected to allege – that the defendants distributed
> brochures containing misinformation to potential customers and
> that the plaintiffs received copies of the brochure prior to the time
> they entered into their contractual agreements with the defendants.
> The plaintiffs have attached a copy of the brochure to the
> complaint and have specifically identified the statements in the
> brochures that are allegedly misleading. At this junction, the
> plaintiffs cannot be expected to know which individuals . . . drafted
> the brochures.

*Petri*, 997 F.Supp. at 974 (internal citations omitted). Applying the same reasoning, it is

apparent that the Liquidator's allegations are sufficient at this point in time to link the individual

officers and directors to the corporate defendants' mailings. Additionally, even under Rule 9(b),

there is a presumption that false and misleading "group published information" is a collective

action of the company's officers and directors. *Petri*, 997 F.Supp. at 974; (quoting *In re*

*GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995); *see also Morse v. Abbott Labs.*, 756

F.Supp. 1108, 1111 (N.D. Ill. 1991) ("[I]n cases of corporate fraud where the false or misleading

information is conveyed in prospectuses, registration statements, annual reports, press releases,

or other 'group-published information,' it is reasonable to presume that these are the collective

actions of the officers."). It is reasonable to presume here that the individual officers and

directors of Alpine and Transco "either drafted, approved, or distributed" the annual statements

and the Non-Resident Insurance Producer Applications. *Petri*, 997 F.Supp. at 974-75.

### (2). It was not necessary for the use of the mails and wires to be "material"

The Defendants argue that the mailings and wire transfers were immaterial to the

allegedly fraudulent scheme and do not satisfy the requirements of the mail and wire fraud

statutes. The Liquidator argues that he does not need to plead materiality. He claims that he only

needs to show that the use of the mails or wires were incident to the scheme.

The Liquidator is correct. "Routine and innocent mailings" can support mail fraud. *United States v. Brocksmith*, 991 F.2d 1363, 1368 (7th Cir. 1993). A mailing or wiring itself, for example, does not have to contain false or misleading information. *United States v. Hickok*, 77 F.3d 992, 1005 (7th Cir. 1996). The mailings do not even need to cause pecuniary loss on their own. *Brocksmith*, 991 F.2d at 1368. They only need to be in furtherance of the scheme. The Defendants have cited to no cases that require a showing of materiality. The Liquidator must only show that the use of the mails or wires were incident to an essential part of the purported scheme. *United States v. Walters*, 997 F.2d 1219, 1222 (7th Cir. 1993) (quoting *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed 435 (1954)).

### (3). The Liquidator alleges that the use of the mails and wires was incident to an essential part of the scheme

The Liquidator's allegations compel a conclusion that the use of the mails and wires was incident to an essential part of the scheme. The Liquidator has alleged that one of the ways the mails and wires were used was to collect the funds that were to be diverted and to transfer the funds to the Defendants. This type of use was "surely instrumental to scheme; indeed it *was* the scheme." *Brocksmith*, 991 F.2d at 1367 (emphasis in original).

Further, this Court finds that the submission of the Non-Resident Insurance Producer Applications and annual reports to the Department of Insurance that purportedly showed the viability of Alpine and Transco also was incident to an essential part of the scheme. Had the documents reflected the true state of the companies, the scheme would have been discovered long before it actually was. "Use of the mails to lull victims into a false sense of security . . .

violates the mail fraud statute, even if it occurs after the money has been fraudulently obtained."

*Id.* at 1367-68 (citing *United States v. Chappell*, 698 F.2d 308, 311 (7th Cir. 1983)); *United States v. Primrose*, 718 F.2d 1484, 1491 (10th Cir. 1983) (mailings made after receipt of money can support RICO violation if the scheme is still in effect). Here, the annual reports and applications allowed the Defendants to carry on their purported scheme for a longer period of time.

### b. The Liquidator sufficiently alleged money laundering as a predicate act

Defendants argue that the Liquidator's allegations of money laundering are baseless because they fail to plead the requisite elements under §§ 1956 and 1957. Both statutes require the Liquidator to show that the proceeds used in the transactions were the result of "specified unlawful activity." *See* 18 U.S.C. §§ 1956(a), 1957(a). "Specified unlawful activity" includes the predicate acts under the RICO Section 1961. *See* 18 U.S.C. §§ 1956(c)(7), 1957(f)(1). Because the Court finds that the Liquidator adequately pled mail and wire fraud, it follows that he has sufficiently alleged that the Defendants engaged in "specified unlawful activity" by purportedly committing those predicate acts. The Liquidator has adequately pled the specifics regarding these transactions in detailing the real estate purchases.[4] Providing the Liquidator with

---

[4] The Liquidator argues that money laundering allegations should be assessed under Rule 8(a), which is more lenient than Rule 9(b). The Liquidator cites to Second Circuit case law in support of this position. This issue has not been decided by the Seventh Circuit, and there is even discrepancy in the Second Circuit as to which standard to apply. *Compare Mezzonen v. Wright*, No. 97 CIV 9380, 1999 WL 1037866, at *8 (S.D.N.Y. Nov. 16, 1999) (money laundering need not be stated with particularity under Rule 9(b)), *and Madanes v. Madanes*, 981 F.Supp. 241, 253 (S.D.N.Y. 1997) *with Wight v. Bankamerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000) (analyzing claims of money laundering under 9(b) standard). Further, at least one other court has called for a heightened pleading requirement. *See Paycom Billing Servs., Inc. v. Payment Res. Int'l*, 212 F.Supp.2d 732, 736 (W.D. Mich. 2002). The Court need not try to resolve this issue, as the money laundering predicate acts are dependent on the mail and wire fraud allegations, which have been sufficiently pled even under Rule 9(b).

all reasonable inferences, he has adequately pled that proceeds used in the alleged transactions were the result of "specified unlawful activity."

## 2. The Predicate Acts Amount To A "Pattern Of Racketeering Activity"

In addition to alleging at least two predicate acts, a civil RICO plaintiff must show that the predicate acts amount to a pattern of racketeering activity. Judge Posner suggests determining whether a pattern exists by first "using the concept of prototypes or family resemblance to identify behaviors sufficiently close to the unquestioned core of RICO to justify the application of the law." *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1338 (7th Cir. 1997). Judge Posner has outlined a few recognized patterns of behaviors that allow for application of the RICO laws:

> A core RICO offense would be a criminal takeover of a legitimate business which the criminal then used to launder his illegal earnings or commit further illegalities behind a facade of legitimate enterprise. Slightly outside the core, and because only slightly outside still within the prohibitory scope of the statute, would be the case of a person who controlled a company and used the mails to progressively fleece an elderly widow – first soliciting an investment of her savings in a Ponzi scheme sponsored by the company, then urging her to sell her furniture and invest her proceeds in the scheme, then inducing her to take out a second mortgage on her house to enable a further investment in the scheme, the whole campaign unfolding over several years and leaving her at the end destitute.

*Id.* (citations omitted). The Seventh Circuit went on in *Fujisawa* to find that plaintiffs stated a RICO claim when they alleged that the defendant, who was a controlling shareholder and officer, lured the plaintiffs into continually investing more money into the enterprise, much of which went into the defendant's pocket. *Id.* Days before deciding *Fujisawa*, Judge Posner outlined other activity for which a court would be justified in applying RICO laws:

31

> A step away from the prototypical case is one in which the criminal
> uses the acquired enterprise to engage in some criminal activities
> but for the most part is content to allow it to continue to conduct its
> normal, lawful business – and many of the employees of the
> business may be unaware that it is controlled and being used by a
> criminal.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997).

The Complaint here alleges activity that is somewhere between the core or prototypical cases and those one step removed. The Defendants allegedly looted Alpine, its policyholders, and Transco by using the companies as cover for illegal activities. The Defendants were able to divert funds by controlling Alpine and Transco. There was some business conducted during the criminal activity, but it is unclear whether any of it was lawful. The scheme led to a loss of policyholder funds and to the need to liquidate Alpine. With these allegations, the Liquidator has met the family resemblance test.

Finding this resemblance exists, the Court now looks to the "continuity plus relationship" test. Under this test "the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Midwest Grinding*, 976 F.2d at 1022 (emphasis in original) (citations omitted). The Defendants claim that both relationship and the continuity are missing.

### a. There is a sufficient relationship between the predicate acts

The relationship prong requires that the predicate acts be "committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct." *Vicom*, 20 F.3d at 779 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 972-73 (7th Cir. 1986)); *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893,

2901, 106 L.Ed.2d 195 (1989) (predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."). The relationship standard is "relatively broad." *United States v. Maloney*, 71 F.3d 645, 661 (7th Cir. 1995).

The predicate acts here are sufficiently related. The predicate acts were mail and wire fraud that purportedly fleeced Alpine and its corporate parent Transco. The diversions of funds, illegitimate stock transactions,[5] and illusory loans and real estate transactions each were designed to transfer money out of the subsidiary and into the pockets of the parent and individual defendants. The transactions built upon one another and occurred at similar times.

### b.     There is continuity among the alleged predicate acts

A plaintiff can satisfy the continuity standard by demonstrating the existence of either: (1) closed-ended continuity that lasted for such an extended period of time that a threat of future harm is implicit, or (2) open-ended continuity that, while short-lived, showed clear signs of threatening to continue into the future. *Midwest Grinding*, 976 F.2d at 1023. The Defendants argue that the Liquidator has not alleged either form of continuity. The Liquidator claims that both closed- and open-continuity exist.

Closed-ended continuity refers to a "closed period of repetitive conduct during a 'substantial period of time.'" *United States v. Torres*, 191 F.3d 799, 807 (7th Cir. 1999). The

---

[5] The Defendants claimed initially that the illicit stock transactions could not support a RICO action. The Defendants relied upon an amendment to the RICO statute, which stated "[n]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The Defendants, however, gave up on this argument once the Liquidator correctly countered that the Defendants had neither explained nor cited to any authority to illustrate how the elements of an actionable securities fraud violation are satisfied by the stock swap.

33

duration of the scheme "is perhaps the closest thing we have to a bright-line continuity test." *Midwest Grinding*, 976 F.2d at 1024. To satisfy the continuity element in a closed-ended case, the Liquidator must prove the existence of a series of related predicates that endured for a "substantial period of time." *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. If these predicates extend for only a few weeks or months, there is no closed-ended continuity. *Id.* at 241, 109 S.Ct. at 2901. While the Seventh Circuit has no *per se* rule on how long the predicate acts must last, *Midwest Grinding* lists a host of cases that find the duration to be insufficient when the scheme lasted less than two years. *See Midwest Grinding*, 976 F.2d at 1024.

Here, the scheme allegedly lasted for seven years. The purported illegitimate stock transactions began in 1989 with the purchase of $15 million worth of preferred stock in Concord. It continued through additional stock transactions, diversions of premium fund trust money and loans until the 1996 Corrective Order. These predicate acts certainly endured for a substantial period of time. The Defendants have cited to no cases holding that a seven year scheme did not last for a sufficient amount of time. Indeed, given that § 1961(5) sets a maximum length for a pattern at ten years, it is hard to imagine that a pattern of seven years does not meet the minimum requirement. The duration element therefore favors the Liquidator.

Although duration remains the critical factor in the continuity analysis, the Seventh Circuit continues to look at the other factors articulated in *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986). *See, e.g., Vicom*, 20 F.3d at 780 (analyzing the *Morgan* factors while recognizing that "duration is the single most important aspect of the closed-ended continuity analysis"and that the others are not dispositive). These additional *Morgan* factors include the number and variety of predicate acts, the number of victims, the presence of separate schemes

34

and the occurrence of distinct injuries. *Morgan*, 804 F.2d at 975. Each of these favors the Liquidator.

The alleged predicate acts include mail fraud, wire fraud, and money laundering through separate schemes involving a diversion of premium fund trust money, illegitimate stock transactions, illusory loans and wrongful real estate deals. The Liquidator has therefore alleged a wide variety of predicate acts that encompass separate schemes. The Liquidator also has pled that the schemes claimed a large number of victims. The Seventh Circuit includes as victims not only those to whom the schemes are directed, but also all others who would have suffered a loss directly from the scheme. *See Vicom*, 20 F.3d at 781. Here, the victims are Alpine and Transco, as well as the numerous policyholders who lost money from the premium fund trust account diversions. The number of victims and schemes also underscores the distinct injuries that were suffered.

This Court finds that the Liquidator has shown the existence of a suitable closed-ended continuity. Because the Liquidator needs only to show that one of the types of continuity existed, the Court will not address whether the alleged conduct amounts to open-ended continuity as well.

### B.     The RICO Counts State Claims Upon which Relief can be Granted

#### 1.     Count I - 18 U.S.C. § 1962(c)

Section 1962(c) states that it is "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In order to state a viable cause of action under this subsection, a plaintiff must allege:  1) conduct 2) of an enterprise 3) through a pattern

4) of racketeering activity. *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). The Defendants argue that the Liquidator has failed to appropriately allege the existence of the first two elements.

A plaintiff alleging a RICO violation must identify the purported enterprise. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995). Federal Rule of Civil Procedure 8(a) governs the pleading of the enterprise. *Majchrowski v. Norwest Mortgage, Inc.*, 6 F.Supp.2d 946, 952 (N.D. Ill. 1998). The alleged enterprise must be separate and distinct from the person to state a claim under § 1962(c). *Bachman v. Bear, Stearns & Co. Inc.*, 178 F.3d 930, 932 (7th Cir. 1999); *United States v. DiCaro*, 772 F.2d 1314, 1319 (7th Cir. 1985); *Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 400 (7th Cir. 1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).[6] The Liquidator alleges that four enterprises existed: (1) Alpine, (2) Transco, (3) TCO Illinois and TCO California, and (4) an association-in-fact[7] between all defendants save TCO Illinois and TCO California. (R. 1-1, Compl. ¶ 87.)

The RICO statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In other words, an enterprise is an ongoing organization, formal or informal, where various associates function as a continuing unit. *United*

---

[6] In contrast to claims under § 1962(c), a defendant may be both the enterprise and the person under subsections (a), (b), and (d). *See Liquid Air*, 834 F.2d at 1306; *see also Haroco*, 747 F.2d at 402 ("Subsection (a) does not contain any of the language in subsection (c) which suggests that the liable person and the enterprise must be separate.").

[7] An association-in-fact is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

*States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). An enterprise cannot, however, simply be a group of people who get together to commit the predicate acts. *United States v. Neapolitan*, 791 F.2d 489, 499-500 (7th Cir. 1986). The enterprise must have "structure, continuity, and common course of conduct." *Richmond*, 52 F.3d at 645. There is no dispute that Alpine, Transco, and TCO Illinois and TCO California meet the requirements of an enterprise. The Defendants argue, however, that the purported association-in-fact between all defendants besides TCO Illinois and TCO California lacks the structure and common course of conduct necessary to be considered an enterprise.

### a. The Liquidator has not adequately pled the existence of an association-in-fact comprised of all defendants besides TCO Illinois and TCO California

In order to have structure, the association must be "joined in purpose" and "organized in a manner amenable to hierarchical or consensual decision-making." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) (citations omitted). The structure and goals of the enterprise must be distinct from the predicate acts they have allegedly committed. *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991).

The Liquidator does not describe this structure at all, nor does he explain which affairs the purported enterprise conducted. The Liquidator only alleges in a conclusory fashion that the association-in-fact enterprise "functioned in a hierarchical decision-making structure as a continuing unit from at least 1989 to 1996, and was engaged in and the affairs of which affected interstate commerce." (R. 1-1, Compl. ¶ 88.) An enterprise cannot exist with only these bare allegations. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676-77 (7th Cir. 2000) (affirming dismissal of complaint where plaintiff did not offer a "command structure" and failed

to define what the enterprise "supposedly does.").

**b.    Exstar and TCO Holdings cannot be the persons where their subsidiaries are the enterprises**

Even using the Liquidator's other alleged enterprises – Alpine, Transco, and TCO Illinois and TCO California – Exstar and TCO Holdings cannot be liable under § 1962(c). The only conduct that the Liquidator has alleged Exstar and TCO Holdings engaged in relates to the purported fraudulent stock transactions, the illicit loans and the illegitimate real estate transactions. The enterprises for these schemes could only be Transco and Alpine. Exstar and TCO Holdings are the corporate parents of both Transco and Alpine. (R. 1-1, Compl. ¶¶ 18, 20, 62.; *see also id.*, Ex. 1.) Corporate parents, however, cannot be the person where their subsidiaries are the enterprise. *Williams v. Ford Motor Co.*, 11 F.Supp.2d 983, 988 (N.D. Ill. 1998) (analyzing *Fitzgerald*, 116 F.3d at 227, and *Emery*, 134 F.3d at 1324). Because the Liquidator has not alleged a proper enterprise for which Exstar and TCO Holdings can be held liable, Count I is dismissed as to those defendants for failure to state a claim upon which relief can be granted.

**c.    TCO Illinois and TCO California can be persons held liable under § 1962(c)**

The Defendants TCO Illinois and TCO California argue that they cannot be held liable under § 1962(c) because the Liquidator has not alleged that they conducted the affairs of Alpine or Transco. The Supreme Court has held that the conduct requirement in § 1962(c) means that a defendant must take some part in the operation or management of the enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 180-185, 113 S.Ct. 1163, 1170-1174, 122 L.Ed.2d 525 (1993). A RICO enterprise may be operated by upper management, lower-rung participants who are acting

under the instruction of upper management, and "others associated with the enterprise who exert control over it, as for example, by bribery." *Id.*; *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 977 (7th Cir. 1995).

This Court does not need to decide whether TCO Illinois and TCO California could be persons where Alpine and Transco are the enterprises under § 1962(c) because the Defendants have overlooked a key enterprise alleged by the Liquidator. The Liquidator's Complaint names TCO Illinois and TCO California as one enterprise under § 1962(c). TCO Illinois and TCO California can each be a person related to this enterprise, even when collectively they encompass the enterprise. *Haroco*, 747 F.2d at 401 ("each participant in the enterprise may be a 'person' liable under RICO but the association itself cannot be."); *Williams*, 11 F.Supp.2d at 985-86 ("a RICO person can associate with an enterprise of which it is but a part."). Unlike the association-in-fact between the other defendants, the Liquidator has adequately described the enterprise here. The Liquidator has alleged the breakdown of their responsibilities in the enterprise, as well as the structure, hierarchical relationship, and common purpose of the association. (*See* R. 1-1, Compl. ¶¶ 19, 21-45.) Further, it is undisputed that TCO Illinois and TCO California each meet the conduct test in § 1962(c) when their association constitutes the enterprise. Defendants Exstar and TCO Holdings are dismissed from Count I. The Liquidator has stated a claim in Count I only against the individual defendants, TCO Illinois and TCO California.

### 2. Count II -18 U.S.C. § 1962(b)

The Defendants challenge the sufficiency of the Liquidator's allegations of a claim under § 1962(b). Subsection (b) states that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of

any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). To state a claim under this section, a plaintiff must allege: (1) that a defendant acquired or maintained an interest in an enterprise through a pattern of racketeering activity, *National Org. for Women v. Scheidler*, 510 U.S. 249, 258-59, 114 S.Ct. 798, 804, 127 L.Ed. 2d 99 (1994); and (2) an injury through a defendant's acquisition or maintenance of the enterprise that is separate from the injuries that resulted from the predicate acts, *Discon, Inc. v. Nynex Corp.* 93 F.3d 1055, 1062-63 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).

The Defendants argue that the Liquidator has not alleged an acquisition or maintenance injury separate from the injuries resulting from the predicate acts. The Liquidator responds that he has alleged in the Complaint that Alpine and Transco were injured by reason of the Defendants' maintenance of an interest in the enterprises.

This Court agrees with the Liquidator. A complaint does not need to have many allegations relating to the injury suffered. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990)). In *National Organization for Women*, the Supreme Court reversed a decision by the lower court to dismiss a complaint for lack of standing to bring a RICO action. In doing so, the Supreme Court illustrated that relatively few allegations are needed to state an injury under RICO:

40

[Plaintiffs] alleged in their complaint that respondents conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere. [Plaintiffs] claimed that this conspiracy "has injured the business and/or property interests of the [plaintiffs]." In addition, [plaintiffs] claimed that [a defendant] threatened [its] clinic administrator with reprisals if she refused to quit her job at the clinic . . . . Nothing more is needed to confer standing on [plaintiffs] at the pleading stage.

*National Org. for Women*, 510 U.S. at 256, 114 S.Ct. at 803.

The Seventh Circuit's decision in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983) is directly on point and shows that the Liquidator's injury allegations are sufficient. In *Schacht*, the Illinois Director of Insurance brought RICO claims under subsections (a) and (c) on behalf of a liquidated insurance company. The plaintiff alleged in *Schacht* that the defendants caused the liquidated company to continue in business even though it was insolvent. As a result of this conduct, the liquidated company was allegedly saddled with additional debts that drove it deeper into insolvency. The Seventh Circuit found that plaintiff had pled an injury distinct from those suffered from the predicate acts. "[I]t is [defendants'] operation in such a manner as to artificially prolong the operation of [plaintiff], not the mail fraud itself, which is separately underscored by the Director as the gravamen of the complaint." *Id*. at 1352.

Here, the same holds true. The Liquidator alleges that the Defendants prolonged the existence of Alpine and Transco in order to continue to fleece the companies and to hide their wrongful actions. The Complaint further alleges that the Defendants maintained an interest in the enterprises during this time. Finally, the Liquidator claims that the injury was caused by reason of the Defendants' violation of subsection (b). Providing the Liquidator with all reasonable inferences, the Defendants' maintenance of their interest in the enterprises injured

Alpine by causing it and Transco to rack up additional debts that would not have otherwise existed. The allegations in Count II are sufficient against the Defendants.

### 3. Count III - 18 U.S.C. § 1962(a)

The Defendants continue their assault on the Complaint by arguing that the Liquidator has failed to state a claim under § 1962(a). This subsection states:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment of operation of, any enterprise which is engaged in . . . interstate or foreign commerce.

18 U.S.C. § 1962(a).

A majority of circuits hold that a claim under this subsection is insufficient if it attempts to plead an injury caused by the predicate racketeering acts. In *Vicom*, the Seventh Circuit mentioned the majority position without adopting or rejecting it:

> [T]he issue of standing arises when a RICO plaintiff alleges that [§§ 1962(a) ] has been violated. Although [the Seventh Circuit] has not addressed the issue to date, the majority of circuits hold that the use or investment of the racketeering income must proximately cause the plaintiff's injury; injury caused by the predicate racketeering acts is inadequate. Moreover, the majority view is that the mere reinvestment of the racketeering proceeds into a business activity is not sufficient for §§ 1962(a) standing.

*Vicom*, 220 F.3d at 778 n.6.

After the Seventh Circuit's decision in *Vicom*, each court in this district addressing the issue has adopted the majority use or investment rule. *Rose v. Mony Life Ins. Co.*, 82 F.Supp.2d 920, 924 (N.D. Ill. 2000) (Gettleman, J.); *Early v. K-Tel Int'l, Inc.*, No. 97 C 2318, 1999 WL

181994, at *5 (N.D. Ill. Mar. 24, 1999) (Gottschall, J.); *Soranno v. New York Life Ins. Co.*, No. 96 C 7882, 1999 WL 104403, at *6 (N.D. Ill. Feb. 24, 1999) (Nordberg, J.); *Fotney v. Kuipers*, No. 98 C 5387, 1999 WL 102772, at *11 (N.D. Ill. Feb. 22, 1999) (Conlon, J.); *Flynn v. Corus Bank*, No. 98 C 1013, 1998 WL 851498, at *3 (N.D. Ill. Dec. 3, 1998) (Andersen, J.); *Chapman v. Ontra, Inc.*, No. 96 C 0019, 1997 WL 321681, at *7 (N.D. Ill. June 6, 1997) (Grady, J.); *Pinski v. Adelman*, No. 94 C 5783, 1995 WL 669101, at *9 (N.D. Ill. Nov. 7, 1995) (Moran, J.); *Pearle Vision, Inc. v. Eye Exam Illinois-Lansing Facility, Ltd.*, No. 93 C 1975, 1994 WL 374272, at *1-2 (N.D. Ill. July 12, 1994) (Holderman, J.); *Pearle Vision, Inc. v. Shames*, No. 94 C 393, 1994 WL 285068, at **6-7 (N.D. Ill. June 24, 1994) (Kocoras, J.). The Liquidator does not contest the appropriateness of the use or investment rule. This Court therefore joins its colleagues in adopting it.

As stated in the analysis under § 1962(b), a plaintiff need not provide many allegations in support of its purported injury. *See National Org. for Women*, 510 U.S. at 256, 114 S.Ct. at 803; *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2137. Within Count III, the Liquidator only alleges in a conclusory fashion that the Defendants violated subsection (b) by receiving income from the racketeering activity and investing it in other business enterprises. (R. 1-1, Compl. ¶ 97.) Looking at the allegations outside of Count III, the Liquidator does not offer any details of the Defendants' purported investments of any income.

The money that was diverted in the premium fund trust accounts scheme was purportedly transferred to the Defendants and other companies within the corporate family. There are no allegations as to how this money was then used to injure Alpine or Transco. With respect to the real estate transactions and loans to O'Shaughnessy, only he apparently received these proceeds.

43

The only allegations with regard to this money is that O'Shaughnessy used the cash to pay his taxes and to support his lifestyle. Again, there are no allegations as to how this money was invested to injure Alpine or Transco.

That leaves the stock transactions scheme. Transco paid $15 million for Concord stock of much less value. Exstar, in exchange, received a $15 million infusion. TCO Holdings sold stock that it had been issued as part of a dividend for $4 million. Transco eventually exchanged its interest in Concord for a promissory note secured by outstanding stock of Classic Fire & Marine Insurance Company. This company was restructured and eventually liquidated. The predicate acts fleeced Transco of several million dollars.

The fleecing of Transco is not in itself an investment injury. The result of Transco's fleecing through these investments, however, supports an investment injury. The Liquidator alleges that Alpine was damaged because Transco was unable to support its reinsurance obligation to Alpine. Alpine, therefore, appears to have suffered an investment injury separate and distinct from the predicate acts.[8]

The Liquidator has stated a claim in Count III for a violation of § 1962(a). This claim is limited, however, to less than the $19 million that the Liquidator has alleged. Only the amount that Alpine lost due to Transco's failure to support its reinsurance obligations – Alpine's

---

[8] The Liquidator could have alleged that the stock transactions were not part of the predicate acts, but were themselves the investment of the proceeds of the racketeering activity. This theory would have allowed the Liquidator to then claim that Alpine and Transco suffered a larger amount of injuries as a result of the investment of the proceeds. Under this theory, however, the Liquidator would need to prove two predicate acts separate from these stock transactions that still meet the "continuity plus relationship" standard. There may be other pitfalls if the Liquidator chooses this approach. If he decides to have the stock transactions solely constitute investments of the proceeds of racketeering activity, the Liquidator should amend his Complaint. As it reads currently, he uses these transactions to support the predicate act requirements.

investment injury – may be recovered.

### 4. Count IV - 18 U.S.C. § 1962(d)

Section 1962(d) does not codify a substantive RICO offense, but simply makes it illegal to conspire to violate any of the preceding sections of the statute. The Defendants claim initially that they cannot be liable for a conspiracy because no violation of subsections (a), (b), or (c) occurred. The Court has already found that the Liquidator adequately alleged these RICO counts. Therefore, the Court will not dismiss the § 1962(d) claim on this ground.

The Defendants also maintain that the Liquidator has not sufficiently alleged the elements of a RICO conspiracy. In order to state a claim for a RICO conspiracy, a plaintiff must allege that (1) the defendants agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendants further agreed that someone would commit at least two predicate acts to accomplish these goals. *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998).

The corporate defendants argue that they cannot be liable under § 1962(d) because the Liquidator does not allege that they specifically made an agreement to engage in conduct that was in violation of subsections (a), (b), or (c). The Court disagrees. The Complaint is full of allegations relating to the conduct and knowledge of the individual and corporate defendants.

Further, it is immaterial that there may not be a specific agreement by a defendant to commit two predicate acts. "[I]t is the well-established law of this Circuit that an individual can be charged under § 1962(d) even if he personally does not agree to commit two predicate acts of racketeering." *Slaney*, 244 F.3d at 600. "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the

45

substantive statute." *Goren*, 156 F.3d at 731. As with the other RICO counts, the Liquidator has stated a claim in Count IV for a violation of § 1962(d).

## III. The State Law Claims

The Defendants next attack the Liquidator's state law causes of action for fraud, conversion, and unjust enrichment. This Court finds that Plaintiff has sufficiently stated a claim for fraud and unjust enrichment, but has failed to state a claim for conversion.

### A. Liquidator has Stated a Claim for Fraud in Count VI

The Defendants maintain that the Liquidator has not pled the fraud claim with sufficient particularity in Count VI. The Defendants' arguments are based on the same Rule 9(b) contentions raised in connection with the RICO causes of action. Because the Court has rejected those arguments earlier, the Court will not address them here. The Liquidator has stated a claim for fraud in Count VI with sufficient particularity.

### B. The Liquidator has not Stated a Claim for Conversion in Count VII

The Defendants claim that the Liquidator's conversion claim cannot survive because he has not alleged the existence of an item that can be legally converted. The Liquidator counters that his conversion claim can survive because the Defendants had the duty to create and maintain premium fund trust accounts.

An identifiable object of property must be the subject of conversion. *Cumis Ins. Soc'y, Inc. v. Peters*, 983 F.Supp. 787, 793 (N.D. Ill. 1997) (citation omitted). Because of this requirement, Illinois law limits the situations where a plaintiff may maintain an action for the conversion of money. "[T]he general rule is that conversion will not lie for money represented by a general debt or obligation." *In re Thebus*, 483 N.E.2d 1258, 1261 (Ill. 1985). Money must

be capable of being described as "specific chattel" in order for it to be the subject of a conversion action. *Id; Cumis*, 983 F.Supp. at 793. To be a specific chattel, the plaintiff must have a "right to a specific fund or specific money in coin or bills." *Mid-America Fire & Marine Ins. Co. v. Middleton*, 468 N.E.2d 1335, 1339 (Ill. App. Ct. 1984). Although the money does not need to be specifically earmarked, it must be in a specified identifiable fund. *Thebus*, 483 N.E.2d at 1260. Without the showing of a specific chattel, a defendant is liable for a debt rather than for a conversion. *Sutherland v. O'Malley*, 882 F.2d 1196, 1199 (7th Cir. 1989).

The Liquidator has failed to allege that the purported converted money is a specific chattel. The Liquidator does not plead, as he must, that the money was placed in a specific fund or is identifiable. *Thebus*, 483 N.E.2d at 1260. In fact, he has pled the exact opposite.[9] "[A]t no time during the terms of these agreements did TCO deposit premium and other monies collected or received on behalf of Alpine or Transco into a segregated, premium trust account." (R. 1-1, Compl. ¶ 28.) The Defendants "permitted Alpine's and Transco's premiums to be commingled with TCO's funds, and wrongfully diverted almost $9,000,000 in premium fund trust monies to other affiliates over a period of several years." (*Id.* ¶ 34.) Based on these allegations, at least some of the money was diverted to other affiliates and none of it is in a specified or segregated account. It is clear that the money is not identifiable or segregated and some is not even in the control of defendants. Accordingly, the Court finds that under Illinois law the Liquidator has failed to state a claim in Count VIII for conversion.

---

[9] While the Liquidator is entitled to all reasonable inferences at the motion to dismiss stage, he may plead himself out of court by including allegations that show he is not entitled to relief on a given claim. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992).

## C. The Liquidator Has Stated A Claim For Unjust Enrichment In Count IX

The Defendants claim that the Liquidator cannot maintain his unjust enrichment claim for several reasons. First, the Defendants assert that the Liquidator has not alleged that any of them besides O'Shaughnessy received a benefit. Second, the Defendants contend that even the benefits that O'Shaughnessy received were pursuant to contracts, and therefore an unjust enrichment claim is barred. The Liquidator counters that his allegations were adequate. The Court agrees with the Liquidator.

The essence of a claim for unjust enrichment is that one party has received a benefit unfairly and that it would be unjust to allow the recipient to retain the enrichment. *Dames & Moore v. Baxter & Woodman, Inc.*, 21 F.Supp.2d 817, 827 (N.D. Ill. 1998). Judge Gettleman has found that a claim for unjust enrichment only needs to allege "that there has been unjust retention of a benefit to the plaintiff's detriment." *Id.* If a plaintiff, however, goes beyond these requirements to allege the existence of a legally enforceable contract, then an unjust enrichment claim can be dismissed under Illinois law. *Premier Elec. Constr. Co. v. LaSalle Nat'l Bank*, 477 N.E.2d 1249, 1257-58 (Ill. App. Ct. 1984).

Contrary to the Defendants' arguments, the allegations in the Complaint are not confined to O'Shaughnessy receiving benefits pursuant to legally enforceable contracts. For example, providing the Liquidator with all reasonable inferences, the premium fund trust agreements may not have been legally binding contracts because of fraud or lack of consideration. Further, the Liquidator has not alleged the existence of any contract related to the illicit stock transactions that caused Transco to shell out $15 million for purportedly worthless stock while Exstar received the same amount from a third party. TCO Holdings allegedly unjustly received $4

million dollars as part of the same series of transactions. Additionally, the Liquidator alleges that the other defendants received benefits as part of the illegal activity. The Defendants' attacks on this claim are not well taken because they ignore these allegations in the Complaint. Accordingly, the Court finds that the Liquidator has stated a claim for unjust enrichment in Count IX.

## IV. The Allegations Related To The Corporate The Defendants Are Sufficient

The corporate defendants argue that although they are each named as defendants in several counts, the Liquidator does not allege that they engaged in wrongdoing. The corporate defendants further maintain that the Liquidator has failed to plead any specific facts showing their knowing participation in the alleged criminal acts. The corporate defendants argue that they should be dismissed from this action.

Indeed, most of the Liquidator's allegations name the individual defendant that engaged in the specific conduct. There can be no doubt, however, that a corporation acts only through its directors, officers, and agents. *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 496 (7th Cir. 1997) (a corporation acts only through its agents); 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 30 (rev. ed.1999). A corporation is therefore liable for the intentional acts of its agents acting within the scope of his authority. *Jansen*, 123 F.3d at 496 (citations omitted); *see also* RESTATEMENT (SECOND) OF AGENCY § 265. The Court is sure that if the Liquidator had only alleged that the corporate defendants had engaged in this conduct, the individual defendants would be up in arms over the lack of details relating to their conduct.[10] The individual defendants here are the officers and directors of the corporate defendants.

---

[10] In fact, Rice actually makes this argument, which the Court addresses in the next section.

Providing the Liquidator with all reasonable inferences, the Court concludes that the Liquidator's allegations about the individual defendants' conduct and their intent also amount to allegations of the corporate defendants' conduct and intent. The corporate defendants' arguments fail. The Liquidator has stated a claim against them, except as otherwise specified in this opinion.

## V. The Allegations Related To Rice Are Sufficient

Defendant Rice argues that the allegations are insufficient to support the claims against him because the Liquidator does not allege that he took part in many of the alleged schemes. Instead of focusing on which allegations do not mention Rice, it is important to look at the allegations that do mention him.

The Liquidator claims that Rice and the other individual defendants were associated with the enterprises through their positions as officers and directors with Alpine and the corporate defendants. (R. 1-1, Compl. ¶ 89.) According to the Complaint, Rice participated in the enterprises by implementing O'Shaughnessy's decisions and instructions. (*Id.*) Rice was among those who allegedly knowingly dissipated assets as part of the premium fund trust account scheme. (*Id.* ¶ 21.) He purportedly knew of the requirement to establish segregated accounts for those accounts, but failed to do so. (*Id.* ¶ 35.) He was an officer who allowed the false group published annual statements to be sent. (*Id.* ¶ 70.) These allegations are sufficient to maintain an action against Rice.

It is irrelevant that Rice may have made no misrepresentations himself. "[U]nder the mail fraud statute, a defendant does not have to make a misrepresentation or omission himself in order to be liable. A defendant need only participate in a scheme to defraud." *Taylor v. Bob O'Connor Ford, Inc.*, No. 97 C 0720, 1998 WL 177689, at *16 (N.D. Ill. Apr. 13, 1998). Further, "it is

irrelevant that the defendant did not personally" conduct the mailing. *United States v. Koen*, 982

F.2d 1101, 1107 (7th Cir. 1992). "A mailing by a third party suffices if it is incident to an

essential part of the scheme." *United States v. Walters*, 997 F.2d 1219, 1222 (7th Cir. 1993)

(internal quotation and citation omitted). The "use of mails" element is satisfied where a

defendant "knowingly cause[d] the mails to be used in furtherance of a scheme to defraud."

*Brockman*, 991 F.2d at 1367. The allegations related to Rice are sufficient.

## CONCLUSION

The Defendants' motions to dismiss are granted in part and denied in part. Count I is

dismissed without prejudice with respect to Exstar and TCO Holdings. Count VII is dismissed

without prejudice against all of the Defendants. Providing the Liquidator with all reasonable

inferences, the remaining counts have adequately stated claims upon which relief can be granted.


DATED: November 26, 2002            ENTERED


AMY J. ST. EVE
United States District Court Judge


51